# EXHIBIT # 2

## William & Mary Bill of Rights Journal

Volume *4 (1995-1996)*
Issue 3

Article 10

May 1996

# The Constitutional Interest in Getting the News: Toward a First Amendment Protection from Tort Liability for Surreptitious Newsgathering

Paul A. LeBel

Follow this and additional works at: https://scholarship.law.wm.edu/wmborj

 Part of the Constitutional Law Commons, and the First Amendment Commons

Repository Citation

Paul A. LeBel, *The Constitutional Interest in Getting the News: Toward a First Amendment Protection from Tort Liability for Surreptitious Newsgathering*, 4 Wm. & Mary Bill Rts. J. 1145 (1996), https://scholarship.law.wm.edu/wmborj/vol4/iss3/10

Copyright c 1996 by the authors. This article is brought to you by the William & Mary Law School Scholarship Repository.
https://scholarship.law.wm.edu/wmborj

# THE CONSTITUTIONAL INTEREST IN GETTING THE NEWS: TOWARD A FIRST AMENDMENT PROTECTION FROM TORT LIABILITY FOR SURREPTITIOUS NEWSGATHERING

Paul A. LeBel[*]

## INTRODUCTION

The *William & Mary Bill of Rights Journal* is to be commended for its prescience in arranging such a timely gathering of a distinguished group of lawyers and journalists to consider a question that has not received a significant amount of attention until some recent developments contributed to a wider public awareness of the issue: To what extent is the way that news is gathered a matter of legal consequence? The most newsworthy of these developments has been the perceived threat of a tort action against CBS News by Brown & Williamson Tobacco Corporation for intentional interference with a contractual confidentiality provision between Dr. Jeffrey Wigand and his former employer Brown & Williamson. Dr. Wigand was a source for a *60 Minutes* segment on the tobacco industry, allegedly in violation of the confidentiality agreement.[1] Further attention to the issue has arisen as a result of an injunction that was imposed on *Business Week* to prevent publication of material that was sealed under a judicial protective order, even though the material had been obtained by the *Business Week* reporter from a source outside the court.[2]

The discussion at the *Journal*'s Symposium panel session was lively, insightful, and instructive. The papers prepared by the principal authors for this issue of the *Journal* are carefully researched and well-reasoned, and will do much to inform both the practice and the scholarship on the topic. The

---

[*] James Goold Cutler Professor of Law, The College of William and Mary. This Commentary is based on a Symposium entitled *Undercover Newsgathering Techniques: Issues and Concerns*, sponsored by the *Bill of Rights Journal* and the Institute of Bill of Rights Law at the Marshall-Wythe School of Law, College of William and Mary. The Symposium was held on February 22, 1996 at the Annenberg Foundation in Washington, D.C.

[1] Bill Carter, *Dispute Erupts at "60 Minutes" over Canceling of Interview*, N.Y. TIMES, Nov. 18, 1995, at 10. Instead, Brown & Williamson sued its former employee but did not name CBS as a defendant. Bill Carter, *Tobacco Company Sues Former Executive over CBS Interview*, N.Y. TIMES, Nov. 22, 1995, at A14. CBS subsequently broadcast the interview with Wigand. Bill Carter, *CBS Broadcasts Interview with Tobacco Executive*, N.Y. TIMES, Feb. 5, 1996, at B8.

[2] Procter & Gamble Co. v. Bankers Trust Co., 78 F.3d 219 (6th Cir. 1996), *vacating*, 900 F. Supp. 186 (S.D. Ohio 1995).

most striking phenomenon of the discussion and the papers that make up the Symposium, however, is the extent to which they are *not* centered on the First Amendment.[3]

The reluctance of practitioners to ground the argumentation of this issue in the First Amendment is understandable, given the current state of the law. Regardless of the judicial precedent, however, and freed from the need to represent a client, a more detached perspective on the question provides a basis for putting forward the proposition that news*gathering* is a realm of journalistic activity that calls out for constitutional scrutiny—and, if appropriate, constitutional protection—just as much as does news *publication*.[4]

There is a rich and growing body of case law and scholarly explication on the ways in which the First Amendment protects the publication of material in the public interest. This Commentary addresses the problem of determining the appropriate relationship between the First Amendment and possible tort liability for news organizations' activities that take place *prior to* publication. That is an issue of vital concern to the integrity and vitality of contemporary journalism and to the broader interests that are served by a vigorous press that is free to conduct responsible investigations of newsworthy stories with a constitutional shield of some meaningful dimension.

The issue of whether the Constitution is implicated in newsgathering activities is not satisfactorily resolved by relying on a premise such as "the First Amendment is no barrier to full responsibility for the consequences of conduct that is wrongful under laws of general applicability," even if some version of that premise should appear to have the imprimatur of a narrow majority of the Supreme Court of the United States.[5] Although a full-

---

[3] Both Professor O'Neil and Mr. Walsh have as their primary focus the effect of media wrongdoing on the liability for publishing the material obtained through that wrongdoing. Professor O'Neil does go on to raise the issue of liability for the wrongful conduct itself. *See* Robert M. O'Neil, *Tainted Sources: First Amendment Rights and Journalistic Wrongs*, 4 WM. & MARY BILL RTS. J. 1005 (1996); John Walsh et al., *Media Misbehavior and the Wages of Sin: The Constitutionality of Consequential Damages for the Publication of Ill-Gotten Information*, 4 WM. & MARY BILL RTS. J. 1111 (1996).

[4] Two notable contributions to the scholarly literature on the topic are Steven Helle, *The News-Gathering/Publication Dichotomy and Government Expression*, 1982 DUKE L.J. 1, and Diane Zimmerman, *Overcoming Future Shock: Estes Revisited, or a Modest Proposal for the Constitutional Protection of the News-gathering Process*, 1980 DUKE L.J. 641. Both articles deal primarily with the issue of press access to information and places within the control of the government.

[5] *See, e.g.*, Cohen v. Cowles Media Co., 501 U.S. 663 (1991). In *Cohen*, the Court observed:

> This case . . . is . . . controlled by . . . the . . . well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news. . . . It is, therefore, beyond dispute that

fledged development of the issue is beyond the scope of a symposium commentary, it is possible to sketch out briefly the way in which such a development might be pursued. Accordingly, this Commentary first identifies the background that demonstrates that the process of newsgathering is not without constitutional significance. That lesson is derived in a three-step reasoning process. First, despite signals from cases such as *Cohen v. Cowles Media Co.*,[6] constitutional inquiry does not and cannot stop with a characterization of behavior as wrongful under otherwise applicable laws. Second, a legal link should be forged to correspond to the logical link between the acquisition and the dissemination of information. Third, the press serves a number of public interest functions in the dissemination of information that the press alone may have the resources, the interest, and the ability to acquire.

From the lesson of the constitutional importance of the newsgathering process, this Commentary proceeds to the question of how best to promote the social good that flows from press acquisition of information. The answer lies in recognizing a qualified First Amendment privilege against the imposition of tort liability for surreptitious newsgathering. This answer is not surprising, given the development of a body of law that places constitutional constraints on significant portions of tort liability for harm caused by disseminating information.[7] The contours of the proposed privilege are discussed in the final portion of this Commentary, along with the consideration of a common surreptitious newsgathering scenario to illustrate the scope and the justification that a fully developed privilege would require.

## I. THE CONSTITUTIONAL SIGNIFICANCE OF NEWSGATHERING

If publication were the only media activity subject to constitutional protection, investigative journalism would be chilled as a result of the potential exposure to liability for criminal or tortious conduct engaged in during the newsgathering process. That deterrence would be of different strength at different times and under different circumstances,[8] but recent developments

---

"[t]he publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others." . . . Accordingly, enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations.

*Id.* at 669-70 (quoting Associated Press v. NLRB, 301 U.S. 103 (1937)).

[6] 501 U.S. 663 (1991).

[7] *See, e.g.,* DAVID ELDER, DEFAMATION: A LAWYER'S GUIDE (1993); DAVID ELDER, THE LAW OF PRIVACY (1991); Paul A. LeBel, *Reforming the Tort of Defamation: An Accommodation of the Competing Interests Within the Current Constitutional Framework,* 66 NEB. L. REV. 249, 252-87 (1987) ("primer" on constitutional developments in defamation law since *Sullivan*).

[8] For consideration of the tort and contract liability of the investigative journalist,

in which investigative reporting targets have aggressively attacked the media investigators indicate that the fear is real, not imagined, and that its effect could be immediate.

This portion of the Commentary explores the issue of whether there is a constitutional significance to newsgathering activity. By analogizing to the constitutional protection that has developed around media publication that defames or invades privacy, the conclusion is reached that newsgathering has constitutional significance, and that the imposition of legal remedies or sanctions on the press raises First Amendment implications.

## A. *Wrongdoing and the First Amendment*

The premise that the First Amendment provides no protection from full liability for one who engages in wrongdoing during the gathering of news suffers from a logical flaw and an analogical shortsightedness. When these missteps are corrected, the identification of a more appropriate premise can proceed.

First, as to logic. Stating that an act committed while newsgathering is a legal wrong—and is therefore afforded no constitutional protection—ignores the extent to which the initial characterization of the act as a wrong begs the ultimate question. What constitutes wrongdoing, whether tortious or criminal in nature, is a function of positive common and statutory law with a constitutional overlay. For laws in general, that constitutional overlay includes a range of personal liberty guarantees that act to constrain the federal and state governments.

For laws that impact the dissemination of information, the First Amendment serves as the greatest constraint on the accountability of publishers and speakers. One cannot conclude that an act is legally wrongful until one has been satisfied that there is no superior First Amendment interest implicated in the attempt to apply criminal sanctions to, or to require the payment of tort damages by, the person committing the act. The proper scope of the application of legal rules that recognize criminal and civil liability can be determined only after a consideration of whether and how First Amendment interests could be threatened by their application.

The closest analogy from which support for this proposition can be drawn is the experience of more than thirty years of constitutionalization of the tort laws of defamation and invasion of privacy. Although the argument

---

see Susan M. Gilles, *Promises Betrayed: Breach of Confidence as a Remedy for Invasions of Privacy*, 43 BUFF. L. REV. 1 (1995); John W. Wade, *The Tort Liability of Investigative Reporters*, 37 VAND. L. REV. 301 (1984); Lyrissa C. Barnett, Note, *Intrusion and the Investigative Reporter*, 71 TEX. L. REV. 433 (1992); Kevin F. O'Neill, Note, *The Ambush Interview: A False Light Invasion of Privacy?*, 34 CASE W. RES. L. REV. 72 (1983).

had been made that the First Amendment does not immunize speakers and publishers from liability under standard tort doctrines of general applicability,[9] the Supreme Court has articulated, beginning in *New York Times Co. v. Sullivan*,[10] a strong vision of a common law tort liability that is tightly constrained when its application affects the public interests protected by the First Amendment.

In *Sullivan*, the Supreme Court of Alabama upheld a judgment awarding the plaintiff damages for libel for the *New York Times*'s publication of an advertisement containing factual mistakes. To the extent that Alabama libel law permitted L.B. Sullivan to recover $500,000 in damages from the *New York Times* and four individuals whose names appeared as sponsors of the challenged fundraising advertisement,[11] the *Times* could surely be said to have acted in a wrongful manner in publishing statements that could be taken as defamatory of Mr. Sullivan. The significance of the Supreme Court's constitutionalization of tort law in *Sullivan* lies in its refusal to let large portions of that law be applied to "speech that matters,"[12] that is, speech that is infused with a public interest. The underlying policy judgment is that the public is better served by a world that allows this type of speech than one in which it is suppressed.

In later cases, the Court articulated the method by which to determine how the First Amendment and the potentially conflicting ends of private law were to be reconciled. Initially stated in terms of striking an accommodation between the interest of the press in immunity from liability and the state interest in support of an individual's claim for compensation,[13] the methodology that courts are to employ was clarified in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*[14] The constitutional acceptability of a rule imposing liability for defamatory speech turns on a balancing of "the State's interest in compensating [people in the position of the plaintiff] for injury to their reputation against the First Amendment interest in protecting this type of expression."[15]

This methodology can be translated to the newsgathering context: if a state were to apply a general law of criminal or civil liability to the press for activities conducted in the course of newsgathering, the *Dun & Bradstreet* analysis should be performed. What is constitutionally permissible to treat as wrongful after *Sullivan* and its progeny is only determinable

[9] *See, e.g.*, New York Times Co. v. Sullivan, 144 So. 2d 25, 40 (Ala. 1962) ("The First Amendment of the U.S. Constitution does not protect libelous publications."), *rev'd*, 376 U.S. 254 (1964).
[10] 376 U.S. 254 (1964).
[11] *Sullivan*, 144 So. 2d at 34.
[12] Gertz v. Robert Welch, Inc., 418 U.S. 323, 341 (1974).
[13] *Id.* at 343.
[14] 472 U.S. 749 (1985).
[15] *Id.* at 757.

when one employs the methodology of *Gertz v. Robert Welch, Inc.*[16] and *Dun & Bradstreet* to balance the interests served by the law creating liability and the First Amendment interests threatened by that liability.

## B. *Acquisition and Dissemination of News*

Although the previous discussion may indicate the methodology that would be used to recognize a constitutional privilege for newsgathering, it remains to be demonstrated that newsgathering is as constitutionally significant as the defamatory speech that was protected in the *Sullivan* line of cases. That demonstration begins at precisely the same place as the reasoning in *Sullivan*, with the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."[17] Working from that principle, the Supreme Court has consistently held that speech that contributes to that debate, even if it is speech that defames or invades the privacy interest of a plaintiff, may not be subjected to the risk of media self-censorship resulting from exposure to common law liability that is not limited or qualified by First Amendment constraints.[18] Although the scope of those constraints may expand or contract depending on such variables as the private or public status of the plaintiff, the private or public nature of the speech, and, perhaps, the media or non-media status of the defendant, the principle that the First Amendment sets limits on tort liability for publication is now so firmly established as to be unquestionable.[19] The analytical framework developed around that principle provides an instructive analogue for responding to the questions of whether, and if so, how, the First Amendment applies to tortious behavior of the media apart from or prior to publication.

Justice Brennan's clarion call in *Sullivan* still rings true: the commitment to vigorous robust debate about matters of public interest is at the heart of the contemporary understanding of the First Amendment. Two features of that commitment need to be understood: it is qualified and it is instrumental. With those features properly in balance, the foundation can be laid for a First Amendment privilege for newsgathering.

The qualified nature of the commitment is evidenced by the continuing sensitivity to the interests of the people whose reputations and privacy are affected adversely during the course of that robust debate. False and defamatory speech may have no constitutional value in itself, but it must be pro-

---

[16]  418 U.S. 323 (1974).

[17]  New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964).

[18]  *See, e.g.*, Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974); Time, Inc. v. Hill, 385 U.S. 374 (1967) .

[19]  *But see* Richard A. Epstein, *Was* New York Times v. Sullivan *Wrong?*, 53 U. CHI. L. REV. 782 (1986).

tected so that the public benefits from exposure to the full panoply of speech that does contribute to the public interest. At some point, however, the constitutional value of the challenged speech can sink below the countervailing interest of protecting the victim of that speech. At that point, the imposition of liability on the speaker passes constitutional muster.

The instrumental nature of the commitment to the principle of robust and uninhibited debate on public issues may be less explicit in the decisions of the Supreme Court than is the qualified nature of that commitment. One might assert, for example, that this principle is a good in itself, rather than just because of the beneficial end it serves. If that is the assertion, then the remainder of this part of the analysis is of less interest, because that starting point is stronger than my starting point. My concern is with those who need to be persuaded that there is a consequentialist, not a teleological, argument underlying the principle of robust debate on public issues. This same consequentialist reasoning can then be used to support the assertion that constitutional protection should extend to newsgathering.

If one asks why a commitment to robust public debate should be a matter of constitutional significance, the most compelling answer lies in the role that the debate plays in a representative democracy. The Constitution is a charter of government, not *Robert's Rules of Order* writ large.[20] The debate is instrumental in the sense that it informs the public, who elect the officials, who exercise the power in ways that are the subject of public debate, which needs to be robust to inform the public, who elect the officials . . . and so on.

In that debate, there may be "no such thing as a false idea,"[21] but there certainly can be uninformed, ill-advised, and pernicious ideas. The corrective function that is served by "the competition of other ideas"[22] is best fulfilled when ideas are grounded in evidence that is as complete and as accessible to the ultimate decisionmakers in the body politic as possible.

The Constitution protects even valueless false statements of fact in an explicitly instrumental way, namely, by dissuading the speaker from self-censorship.[23] If one sees the speech that is being promoted, or at least not deterred, as itself instrumental in the governance process preserved by the Constitution, then it requires only a short step to realize that the constitutional inquiry encompasses not only the publication of the factual statements, but also that it extends to the way in which these factual statements are acquired.

---

[20] *Cf.* Terminiello v. Chicago, 337 U.S. 1, 37 (1948) (Jackson, J., dissenting) (noting a danger that the Supreme Court "will convert the constitutional Bill of Rights into a suicide pact").

[21] *Gertz*, 418 U.S. at 339.

[22] *Id.* at 340.

[23] *See id.* at 340-41.

A truly robust public debate contemplates something richer than a purely formal exchange of fixed positions. The notion of public debate anticipates an openness to the consideration of new ideas and a willingness to accommodate new information. Much of the content of the debate about public issues is likely to come from somewhere outside of the pre-existing knowledge of the individual debaters. A healthy and valuable debate certainly ought to include the opportunity for some meaningful addition to the store of information with which the citizens, who ultimately pass on the merits of the competing ideas, are equipped at the start. Indeed, that something *is* a public issue requiring careful consideration is often the result of an active process of bringing a matter to the public's attention.

At this point in the analysis, one might fall back onto the premise articulated at the outset of this Commentary. One might say that the speech that enters into the public debate about matters of public interest is fully protected, but the means of acquiring the content of that speech are outside the purview of the constitutional provisions that protect its publication. To do so, however, would be to repeat at the level of instrumental analysis the missteps criticized earlier as matters of limited logic and too narrow analogy.

If the ideas and opinions in the public debate are to compete for public acceptance, and if their strength depends on the quality of the supporting evidence, then the process of acquiring that evidence should be understood to share in the constitutional attention at least to the extent that is given to speech that injures reputation and invades privacy. To hold otherwise would be to limit the public debate to the exchange of views about information that others have interjected voluntarily into the public arena. Such a limitation would value form over substance, or place a premium on form at the price of ignoring its effect on function.

If it is not to be a sterile exercise, debate about public issues should be constantly reinvigorated with new information and fresh ideas. To deter the acquisition of new information by the threat of civil or criminal liability raises the same constitutional problem as the deterrence of the publication of information that may turn out to be false and defamatory or invasive of privacy. "[S]peech . . . matters"[24] because of what it contributes to an informed citizenry exercising control over the course of their lives and the conduct of their government. Because the inventory of the storehouse of facts that inform the "speech that matters" must continually be replenished and expanded for the debate about what matters to be effective, how that process occurs cannot plausibly or responsibly be treated as a matter of constitutional indifference.

One of the lessons that emerges most clearly from the defamation and privacy arena is that an individual can be classified as a public figure and

---

[24] *Id.* at 341.

thereby be deprived of some measure of common law tort protection against defamation and invasion of privacy.[25] This occurs because of a legitimate public interest in the publication of information about some aspect of the public figure's life. Against that constitutional background, no great leap of imagination is required to envision an analogous category of information that is in the public interest, albeit not yet in the public domain.

## C. *The Public Interest in the Media Acquisition of News*

If the same constitutional interest in the publication of information and ideas extends to the acquisition of that information, one might still contend that the media are entitled to no greater protection in their news acquisition activities than would be available to private individuals or officers of the government. The final piece of the foundation for constructing a constitutional privilege for newsgathering requires an appreciation of why there is a public interest in protecting media representatives when they carry out their newsgathering activities.

The constitutional principles that have developed in the resolution of media access issues support the notion that the Constitution is implicated in how news is gathered. Limiting the acquisition of information to private individuals would be to ignore the reality of the role that the press serves in identifying not just what the public will be interested in but also what is in the public interest. If the press is entitled to access to a courtroom, for example, as a surrogate for the individual citizen who herself could choose to invest the time and energy in observing that part of the governmental process,[26] then an important point in the construction of the constitutional privilege for newsgathering is the idea that the press may act in a way that an individual citizen may act in acquiring information.

Acquisition of information is often an expensive enterprise. The public's limited access to certain areas and its limited resources justify recognizing the surrogate role of the press. Similar justifications based on access and on resources affect what ought to be constitutionally permitted during the course of surreptitious newsgathering. The public at large has an interest in the role that the press plays in informing the public about the behavior of others, in affecting the conduct of public officials and public figures, and in deterring wrongful conduct by both public officials and private individuals.

That public interest could be served in theory by a government official, but relying exclusively on the government to serve these functions is misguided in two respects. First, the target of an investigation often may be the government itself. To restrict public debate to information that public officials choose to interject into that debate would be to provide a dispropor-

---

[25] *See, e.g.*, Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967).
[26] *See, e.g.*, Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980).

tionate advantage to the holders of public office. Second, to the extent that the target of an investigation is a private rather than a public person or entity, even when the target is engaged in criminal wrongdoing, there may well be insufficient attention paid to the problem by the government officials charged with enforcing the relevant provisions of the criminal code. In a world of limited investigatory and prosecutorial resources, even the most benignly motivated decisions about where to devote time and energy necessarily depend on efficiency calculations and on assessments of how to achieve the broadest public good. Media activity, particularly in the form of investigative journalism, can be a valuable supplement to official conduct. The press can help not only to shape the agenda of law enforcement authorities, but also to alert the public about the threat posed by the target of the investigation.

## II. TOWARD A CONSTITUTIONAL PRIVILEGE FOR NEWSGATHERING

Thus far, this Commentary has provided a glimpse of the blueprint for constructing the steps in the reasoning that leads to the conclusion that the Constitution is implicated when a state attempts to hold the press liable for newsgathering activity. The core notion of the constitutional privilege that should be developed for newsgathering flows naturally from the instrumental argument presented above. News acquisition is a matter of constitutional significance because it is a logically and pragmatically necessary component of the publication of news that serves a vital constitutional function. Accordingly, the basic premise of this privilege for newsgathering can be stated in the same instrumental terms:

> *The First Amendment offers protection for conduct leading to the acquisition of information that it would be in the public interest to publish.*

Whether the imposition of liability is constitutionally permissible should depend on the result of the same balancing methodology that is employed in the area of First Amendment protection of tortious speech:

> *Courts should balance the state interest that is served by the legal rule sought to be applied against the representative of the press arising out of the newsgathering activity against the First Amendment interest that is served by the acquisition of the information through that activity.*

For the same reasons that constitutional privileges developed around liability for defamation and invasion of privacy, the balance should not be struck on a purely case-by-case basis. Rather, courts should "lay down broad rules of

general application," even though those "rules necessarily treat alike various cases involving differences as well as similarities."[27] Just as the constitutional protection for the publication of damaging information is qualified rather than absolute, so too is this privilege:

> *The First Amendment protection for acquisition of information can be overcome by a stronger state interest in forbidding certain activity and in attaching criminal and civil sanctions to conduct that contravenes those prohibitions.*

The employment of any balancing methodology creates the potential for controversy regarding what should be weighed in the balance and the amount of weight that should be given to any particular factor. To get a sense of how a balancing would shape the contours of the privilege advocated in this Commentary, consider an investigative journalistic situation loosely based on what is increasingly appearing on the networks and on syndicated programming: the use of an undercover reporter with a hidden camera.

Suppose that a news organization believes that a private business firm is acting in a way that threatens the public health or safety. Real life examples of this hypothesis can be found in such current litigation settings as the action by Food Lion against ABC News for its *Prime Time Live* investigation of the food chain's meat selling operations.[28] During the panel discussion of these issues at the *Journal* Symposium, one of the participants presented another *Prime Time Live* story on a driving school for persons convicted of driving while intoxicated. This school sold course completion certificates to people who did not attend the course and who were then able to retain or get back their driver's licenses.[29]

The basic fact pattern at issue is that an investigative journalist misrepresents his or her true status and obtains entry to a location controlled by the party who will soon become the tort plaintiff. While at that location, and in the assumed role, the reporter is able to observe and photograph behavior of the plaintiff or its agents. Eventually, a report about the behavior is aired. Presumably, the First Amendment analysis of the media defendant's publication or broadcast of the information acquired in this manner could be conducted under the constitutional framework currently in place. The question for consideration is whether the media defendant is subject to liability for conduct that occurred while investigating the story using the surreptitious methods described above.

---

[27] *Gertz*, 418 U.S. at 343-44.

[28] Food Lion, Inc. v. Capital Cities/ABC, Inc., 887 F. Supp. 811 (M.D.N.C. 1995).

[29] *See Prime Time Live: School for Scandal* (ABC television broadcast, Sept. 20, 1995).

As the *Food Lion* litigation indicates, the claims asserted against a news organization can revolve around four different aspects of the reporter's conduct: (1) misrepresentation of the status of the reporter; (2) physical entry into the premises of the investigative target; (3) hidden recording of the target's employees; and (4) concerted action with people outside of the news organization to obtain and publicize information about the target that would be damaging to the target and/or beneficial to the third party.[30] The proper scope of liability for each of these aspects of media conduct can be analyzed through the use of the balancing methodology described above.

The remainder of this Commentary will offer a very preliminary sketch of the interests involved and of the policy implications of subjecting the media behavior to liability. Even such a cursory sketch can be useful in indicating the ways in which a more extensive consideration of the shape and strength of a constitutional privilege could be developed.

## A. *Misrepresentation of Media Status*

Some years ago, the *New Yorker* published a cartoon under a caption such as "The Man with a Clear Conscience", in which a stereotypical businessman sat behind a large desk, smiling and speaking something like these words into an intercom: "You say Mike Wallace is here with a camera crew? Well, send him right in!" Today, the news magazine crew may very well be bringing with it a copy of a videotape recorded by an undercover camera in one of the interviewee's plants or offices. The purpose of the interview may be to get the target's reaction to the hard evidence of corporate wrongdoing. Indeed, the interview may begin with the target being invited to issue routine denials of wrongdoing that are then shown to be inconsistent with the evidence on the tape.

Disguising the status of the reporter is an obvious tactic of investigative journalism. If I am engaged in wrongdoing, I am at least likely to be smart enough to cease that activity when the network news producer shows up with a camera and a microphone. Getting someone in place to observe me acting in an illicit manner depends in large part on characterizing the reporter as someone other than a reporter.

Misrepresentation claims arising out of the disguise are not far-fetched in many of these settings. If I would not have acted in a certain way had I known who the reporter was, and if because the reporter purported to have some other status I acted in that way in the presence of the reporter, then I may be said to have relied to my detriment on the false and material statements of fact by the reporter.[31] Should the airing of the information obtained in this fashion result in harm to me, including economic harm that

---

[30] *See Food Lion*, 887 F. Supp. at 816-22.

[31] *See* RESTATEMENT (SECOND) OF TORTS § 525 (1977).

flows from the publication or broadcast, then traditional tort doctrines would allow me to recover damages for that harm.[32] The issue of whether there is a constitutional restriction on media liability for the misrepresentation of the reporter's status is thus a matter of considerable importance.

The balancing methodology proposed in this Commentary calls for an initial identification of the factors that are placed on each side of the scale: the First Amendment interest in the acquisition of the information by disguising or misrepresenting the status of the reporter versus the interest served by the legal rule that imposes liability on the news organization for its misrepresentation. Once the factors on each side of the balance are known, then an informed policy choice about the more compelling of the two interests can be made, and the legal rule that attaches liability to media behavior can be either upheld or struck down as violative of the First Amendment.

On the First Amendment side of the balance, the necessity for the misrepresentation would be one of the most important factors. If absent the disguise, the reporter would probably not have had access to the wrongdoing, then the First Amendment interest is stronger than it would be in a case where the reporter's status is irrelevant.

Of equal importance to the necessity of the misrepresentation would be the nature of the public's interest in the information being acquired. If press access to the wrongdoing is necessary to inform the public about a matter of public interest, then the First Amendment side of the scale receives even more weight. Although line-drawing between categories of speech is risky and controversial, one can nevertheless contemplate a rough distinction between matters that are merely interesting to the public and matters that are infused with a public interest. The more confident one is in characterizing the information in the latter category, the greater the weight attached to the First Amendment interest in the acquisition of the information, even though that acquisition is obtained as a result of a reporter misrepresenting her status.

Attention should also be paid to the reasonableness of the news organization's belief that the investigation is warranted. This would require an examination of the credibility of sources and the body of evidence extant at the time the investigation moved to the stage of misrepresenting the status of the reporter.

The state interest in being free from misrepresentations of the status of those with whom one deals is not trivial. We routinely depend on the qualifications of those who provide services and on the legitimacy of the claims of those who ask us to act in certain ways. When the target of the investigation is acting in a wrongful manner, however, the interest in the accuracy of the representation may be entitled to less weight.

---

[32] *Id.* § 549.

The most critical factor in assessing the strength of the interests protected by tort law in this situation is likely to be the nature of the access that the reporter obtained through the disguise. If my wrongful conduct routinely occurs in the presence of others, either because I enlist them in the wrongdoing or because I assume that they are coming to me to get the benefit of my wrongdoing, then the misrepresented status of the reporter should be less problematic to the body of law that protects me from the consequences of that misrepresentation. What matters most in this scenario is that my conduct would have been equally observable by someone who was not a reporter. The news media affiliation of the person in whose presence I act is a risk that I could be said to have assumed, in much the same way that I would run the risk that the person was actually an undercover law enforcement officer.

## B. *Physical Entry into the Target's Premises*

When an investigative journalist enters the property of the target, the civil and criminal laws of trespass may come into play.[33] Tort liability may attach to an entry that is without the permission of the owner or occupier of the premises or that exceeds the scope of the permission.[34] Leaving a recording device on the premises of the investigatory target without the permission of the target could constitute a continuing trespass.[35]

As is true in many instances of tortious behavior in newsgathering, the unauthorized nature of the entry into the premises of the tort plaintiff is often combined with misrepresentation of the status of the reporter. Had the true status of the reporter been known, permission to enter would have been denied or the permission originally expressed or implied would have been withdrawn.

The state interest in enforcing exclusive possession and the right to exclude others from one's own property is quite high. Nevertheless, the First Amendment may also be implicated by the existence of a public interest in members of the news media obtaining information about those acts that occur on one's property that have the potential to affect public health or safety. If the two interests were weighed in the abstract, one would suspect that the property right would trump the interest served by a private person's invasion of the premises of another, given the historical prominence of the interest in exclusive possession.

---

[33] *See* Note, *And Forgive Them Their Trespasses: Applying the Defense of Necessity to the Criminal Conduct of the Newsgatherer*, 103 HARV. L. REV. 890 (1990); David F. Freedman, Note, *Press Passes and Trespasses: Newsgathering on Private Property*, 84 COLUM. L. REV. 1298 (1984).

[34] RESTATEMENT (SECOND) OF TORTS § 158 (1965).

[35] *Id.* § 161.

One clear lesson from the experience of determining how the First Amendment sets constraints on the imposition of liability for the publication of damaging information is that the balancing is to be done with a focus on the particular legal rule under which the publisher is sought to be held liable. The balancing methodology for deciding whether there is a First Amendment protection against liability for some intrusions into the premises of an investigative target could very well be directed not toward the abstract principle of the importance of an exclusive possessory interest, but rather on how the law seeks to enforce that interest.

The traditional trespass notion of allowing damages even if no harm is done to the premises or its occupants could be an appropriate element to consider in exercising constitutional scrutiny.[36] Historically, the tort of trespass to land has been one of the most formalistic causes of action. The interest that is protected by the tort action is the exclusivity of the possessory right, so liability may be imposed even if no harm is done to the premises. The mere fact of entry is inconsistent with the control over access that the occupier is entitled to exercise, and damages can be awarded for the entry itself.

Under an alternate view of the tort that accommodates a First Amendment interest in the entry, the focus would turn from the mere fact of the reporter's unauthorized entry to what is done while the reporter is on the premises. Physical damage to property would be difficult to protect, but observation and recording of what is otherwise visible and audible would be considerably more defensible. The First Amendment interest could thus, under some circumstances, be found to outweigh the countervailing state interest in the recovery of damages for the entry itself, rather than for the damage that is done by or during the unauthorized entry.

## C. *Hidden Recording of the Target's Activities*

The adoption of aggressive investigative journalistic techniques by the broadcast media opens the door to recording of sounds and pictures that are intended to be broadcast to the public, rather than just to serve as background information in support of a written news account. The critical inquiry is whether recording the events that take place during entry onto the premises of another receives constitutional protection similar to the entry itself.

The most useful analogy in deciding how to approach this aspect of investigative journalism would be the creation of, under the guise of this privilege, a counterpart to the plain view doctrine of the law governing search and seizure. A reporter rummaging through my files when I am out of my office, for example, presents a very different scenario from a reporter

---

[36] *Id.* § 163.

standing across from my desk and surreptitiously taping my offering or accepting a bribe. What I do in the presence of others would seem to involve less of a state interest in protecting me from recording than what I have taken steps to secure from public view.

Just as the state or private interest needs to be weighed only after focusing on the precise features of the legal rule that attempts to protect or enforce that interest, so too the First Amendment interest needs to be identified in terms of the precise category of journalistic behavior that is at issue. Following this suggestion, one might hypothesize that there is a significant First Amendment interest in the activity of hidden recording that is different from and perhaps stronger than the interest in mere presence on the part of a reporter. The additional credibility associated with the images and the sounds that are recorded in an encounter of this sort contributes to the public information about the matter in question in a more meaningful and dramatic way than an account of the encounter that is unsupported by film or tape.

One can imagine other press tactics that are more troublesome because the interest of the target of the investigation weighs more heavily. A hidden camera or tape recorder carried by a reporter is in many respects an extension of the eyes or ears of the reporter. A recording device secreted in the office of the target, however, would have the capacity to capture actions and conversations that occur when no one comparable to the reporter is present. Although the First Amendment interest in the acquisition of the information may be identical to what it was in the case of the recorder carried by the reporter, the interest against devices being planted on the premises of the target, grounded in the expectation of privacy when the person (who turns out to have been a reporter) was no longer present, would likely rise to a level that is sufficient to overcome the constitutional interest.

## D. *Concerted Action with a Third Party*

Although it is not impossible that an investigative journalist may simply wake up one morning and decide that there must be a story at the X Corporation that is worth an investment of time, energy, and money, the more likely scenario is that someone other than the news organization personnel and the target is involved in setting the stage for the investigation or in assisting in its pursuit. Along with all the other aspects of exposure to liability that may be attached to surreptitious newsgathering, the media organization may find itself a defendant to a claim that it has conspired with the third party to cause harm to the investigative target[37] or to provide a benefit to the third party.

---

[37] *See, e.g.*, Food Lion, Inc. v. Capital Cities/ABC, Inc., 887 F. Supp. 811 (M.D.N.C. 1995) (dismissing RICO claims against ABC and network employees).

Two scenarios of the relationship to the third party need to be considered. In the first scenario, the media representative is approached by a third party and provided with information that suggests a promising avenue of investigation. In the second, the media representative approaches a third party in a search for investigative leads. These situations are closer to the heart of the journalistic enterprise than any of the other three aspects of media behavior. Allowing a tort claim against the media in these situations constitutes a serious infringement on the interests of the press and the public in the acquisition and dissemination of information.

When a member of the press is approached by a source, the potential exists for linking the media to the enterprise in which the source is otherwise engaged. The possibilities for press involvement range from a relatively innocuous ride-along relationship with law enforcement officers to much more questionable conduct on the periphery of ongoing criminal conspiracies. The issue that might arise in these situations is whether the media representative should be exposed to liability on the same basis that would be applied to the source. For example, if the police officers with whom a journalist was riding were held liable for damages for the harm caused by their activities, could the journalist similarly be held liable? If the source of information about an unlawful activity were himself engaged in unlawful activity, would the journalist who works with the source be exposed to similar liability?

The appropriate consideration in assessing the liability of the media representative for involvement in the activity engaged in by the source is the journalist's connection to the activity, not the connection to the source. The application of vicarious liability or conspiracy theories of liability to the press under these circumstances would impede the flow of information that could be obtained from these contacts, from which the public could ultimately benefit. The important feature of these situations is the journalistic role occupied by the press representative. To hold the press liable to the same extent as the source would be to ignore the role of the press and the public interest it serves.

When the investigative function is not at issue, or when other aspects of journalistic behavior might lead to a conclusion that liability ought to be imposed, the First Amendment interest in the acquisition of information may be outweighed here as in other instances. One can imagine, for example, a reporter on a police "ride-along" who damages the property of someone whose premises are raided by the police. There is little, if any, First Amendment interest in protecting the media from liability for that property damage. There is a significant First Amendment interest, in contrast, in protecting the media from liability for the intrusion into the premises or for the privacy invasion that might occur. Those latter claims go to the essence of the journalistic activity. Even if the police officers themselves should ultimately be held liable, the liability ought not to extend to the press representative who accompanied the officers.

The contact between the press and the source may arise in precisely the opposite fashion, with the source being contacted by the reporter. In this situation, the exposure to liability is more likely to come from a claim that the media conduct has induced the source to act in a way that is damaging to the investigative target. The recent publicity surrounding the CBS *60 Minutes* segment on the tobacco industry raises the issue of tort liability in a very compelling fashion, as well as bringing to the foreground the public interest served by the press in these situations.[38]

Tort liability for interference with a contract between the source and the target, or for otherwise interfering with advantageous relationships of the target, has a built-in interest-balancing that would seem perfectly capable of resolving the issue of whether an imposition of liability would serve a broader public interest.[39] The *Restatement (Second) of Torts* provisions on liability for an intentional interference with contractual relations are phrased in terms of "improper" interference.[40] The factors for determining whether an interference is improper replicate the kind of interest analysis suggested in this Commentary as being not only appropriate for, but required under, the First Amendment.[41]

There is an advantage in recognizing that there is a public interest that has constitutional significance when deciding whether an interference is improper. Grounding this interest in the First Amendment means that courts would be required to accord it full constitutional weight, undiluted by any local resistance to, or skepticism about, the wisdom of the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."[42]

CONCLUSION

A brief commentary on a symposium topic can hope to do little more than to reinforce the significance of the subject with which the symposium deals and to suggest promising avenues for further scholarly efforts. This Commentary has attempted to show that the legal issues surrounding liability for surreptitious newsgathering are matters of considerable doctrinal and policy complexity.

If those issues are to come before courts with greater frequency, as seems likely to happen, careful attention needs to be given to striking an

---

[38] *See* James C. Goodale, *CBS Must Clear the Air*, N.Y. TIMES, Dec. 6, 1995, at A23.

[39] Sandra Baron et al., *Tortious Interference: A Practical Primer for Media Practitioners*, 4 WM. & MARY BILL RTS. J. 1027 (1996).

[40] RESTATEMENT (SECOND) OF TORTS § 766 (1979).

[41] *Id.* § 767.

[42] New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964).

appropriate balance between the interests traditionally protected by the First Amendment and the interests served by the rules of tort law, under which liability is sought to be imposed on journalists who gather the news using undercover methods. Demonstrating that such a balancing is needed, constitutionally appropriate, and manageable are tasks for the future. This sketch of a way to construct the argument and a preview of some features of its applications to investigative journalism illustrates that the tasks are worth undertaking.

ZAJI ZAJRADHARA